FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 07 2016 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DISNEY ENTERPRISES, INC.,

           Plaintiff,

- v. -

FINANZ ST. HONORE, B.V.,

           Defendant.

-----------------------------------------------------------x

OPINION & ORDER

13-cv-6338 (NG) (SMG)

**GERSHON, United States District Judge:**

Plaintiff Disney Enterprises, Inc. ("Disney") brings this diversity action against defendant Finanz St. Honore, B.V. ("Finanz") based upon a Trademark Purchase Agreement (the "Agreement") under which Disney purchased trademarks from Finanz. The Agreement contains indemnification clauses in which Finanz agreed to indemnify Disney in certain circumstances. It is the scope of one of these clauses that is the principal issue in this action. Disney is seeking damages, essentially attorneys' fees and costs, that resulted from an alleged breach of its indemnification rights. In addition, under a separate undisputed indemnification clause in the Agreement, Disney seeks the attorneys' fees and costs it has incurred in bringing the instant action. Finanz asserts two counterclaims. First, it seeks a declaratory judgment that defines the scope of its indemnification obligations. Second, it brings a breach of contract claim of its own arguing that, for those expenses that it did pay on Disney's behalf, it overpaid.

Disney moves for partial summary judgment as to liability on its breach of contract claim and claim for attorneys' fees in this action, and it seeks dismissal of Finanz's counterclaims. Finanz moves for summary judgment on its declaratory judgment counterclaim and partial summary judgment on liability as to its breach of contract counterclaim.

## I. Introduction

### A. Background of the Contractual Provisions

The following facts are undisputed unless otherwise noted. Since 1953, Disney has owned the trademark "Tinker Bell," which is based on the Tinker Bell fairy associated with Peter Pan and other Disney productions. Prior to 2006, Finanz owned the trademarks "Tinkerbell," "Tink," and the "Big T" (collectively, the "Trademarks"). On March 1, 2005, Finanz licensed its trademark "Tinkerbell" to Ice Box, Inc. ("Ice Box") for it to use on, *inter alia*, fragrances, cosmetics products, and bath and body products.

In 2005, Disney was preparing to launch its "Fairies" brand of consumer products with the Tinker Bell mark and image. As part of this product launch, Disney wanted to acquire the Trademarks from Finanz. By October of 2005, Finanz and Disney had signed a letter of intent ("LOI") providing that Disney would pay Finanz $3,000,000 for the Trademarks. The LOI also stated that the purchase's consummation would be contingent on Finanz terminating its licensing agreement with Ice Box, with any expenses related to such termination to be paid by Finanz. On October 31, 2005, Finanz terminated the Ice Box license by citing numerous non-curable breaches; Ice Box claimed that it was not in breach and that Finanz was acting in bad faith for the purpose of removing any obstacles to its deal with Disney. Ice Box would ultimately sue Finanz in 2007 in relation to the termination of its license. After a jury trial, Ice Box won a judgment for fraud and breach of contract. *See Icebox-Scoops, Inc. v. Finanz St. Honore, B.V., et al.*, No. 07-CV-544 (NG) (SMG), (E.D.N.Y. 2007), *appeal withdrawn subject to reinstatement*.

From October of 2005 to February of 2006, Disney and Finanz engaged in negotiations regarding the purchase of the Trademarks and circulated multiple versions of the Agreement as it evolved to reflect the negotiations. As of December 5th, the draft Agreement contained Finanz's

representation that it had validly terminated the Ice Box license and that Ice Box "shall have no rights in and to and no rights to use or otherwise exploit the [Trademarks] on and after the Closing Date." Declaration of Rachel Schwartz in Support of Disney's Motion for Summary Judgment ("Schwartz Decl.") Ex. 20 at 6. Also in this draft of the Agreement, there was a general indemnification clause to cover "any misrepresentation or breach of the representations and warranties of [Finanz] contained in or made pursuant to this Agreement." *Id.* at 11.

The parties agree that, despite the provisions described above, Disney remained concerned about the Ice Box license and considered a satisfactory resolution of this issue critical to closing the deal. By January of 2006, resolving the Ice Box license was the primary open issue. The final version of the Agreement contained a "carve out" from the general indemnification clause to specifically address the Ice Box license. Section 3.4 of the final Agreement contained the following clause (the "Clause"), entitled "Ice Box License—Indemnity:"

> (c) [Finanz] agrees to indemnify and hold [Disney] harmless, fully and without limitation except as may otherwise be stated in this Agreement, from any claims, actions, demands, liabilities, damages or costs asserted by Ice Box, Inc. against [Disney] or [Finanz] and for which [Disney] may become responsible, whether or not such claims or actions be rightfully or wrongly brought or filed, arising out of the Ice Box License, [Finanz's] acts in terminating the Icebox License, the assignment of the Icebox License to [Disney], and/or any act by [Disney] or [Finanz] in negotiating this agreement or the consummation thereof.
>
> (d) This indemnity shall extend from the date of Closing for six years thereafter.
>
> (e) In case any demand is made or action filed by Ice Box against [Disney] which triggers [Disney's] rights under the indemnity as stated in this Section 3.4, [Disney] shall be entitled at its sole discretion to employ an attorney of [Disney's] own selection to appear and defend [Disney] at the expense of [Finanz] . . .
>
> (g) If [Disney] in the enforcement of or against any action or demand by Ice Box which is subject to this indemnity, shall incur any expense directly related to the action or demand due to [Finanz's] failure to indemnify [Disney] or otherwise fulfill [Finanz's] obligations to [Disney] as stated in this Section 3.4, including but not limited to attorneys' fees and court costs, [Finanz] agrees to reimburse [Disney]

for such expenses within thirty (30) days after receiving notice from [Disney] of the incurring of said expenses.

This Clause was separate and apart from the Agreement's general indemnification clause, found in Section 9.2 of the Agreement, which provides:

> Subject to the conditions and provisions of this Section 9.2 and Section 9.4, and except for those matters which are subject to indemnification under Section 3.4, [Finanz] agrees to indemnify, defend and hold harmless [Disney] from and against any and all demands, claims, complaints, actions or causes of action, suits, proceedings, investigations, arbitrations, assessments, losses, damages, liabilities, cost and expenses . . . asserted against, imposed upon or incurred by [Disney], directly or indirectly, by reason of or resulting from a) any liability or obligation of or claim against [Finanz] (whether absolute, accrued, contingent or otherwise and whether a contractual, tax or any other type of liability or obligation or claim); (b) events or circumstances occurring prior to the Closing Date, arising out of, or relating to or resulting from the Assets and/or the business of [Finanz] related to or associated with the Assets; or (c) any misrepresentation or breach of the representations and warranties of [Finanz] contained in or made pursuant to this Agreement. With respect to indemnity claims arising pursuant to subsection (c) above, [Disney] shall be entitled to indemnification from [Finanz] under such subsection only to the extent that the aggregate of all indemnity payments that would otherwise be payable to [Disney] hereunder exceeds Thirty Thousand U.S. Dollars ($30,000) at which time only claims in excess of $30,000 shall be recoverable; provided, however, that in no event shall [Finanz's] aggregate liability under subsection (c) above exceed the Purchase Price.

The parties entered into the Agreement on February 23, 2006, and Disney wired Finanz $3,000,000 on February 27. On February 1, 2010, Ice Box sued Disney and its parent company claiming, *inter alia*, that Disney interfered with Ice Box's existing and prospective contractual relations ("Disney Litigation"). On February 8, 2010, Disney notified Finanz of the suit and stated that it triggered the Ice Box indemnity in the Agreement. Disney retained Fitzpatrick, Cella, Harper & Scinto ("Fitzpatrick") to defend it against Ice Box, and Finanz arranged to directly pay Fitzpatrick's legal fees, which it did until May 31, 2012. On that date, Finanz made its final payment in the amount of approximately $30,000 (which covered legal services performed by Fitzpatrick through March 31, 2012). In total, Finanz paid Fitzpatrick $101,689.65 without

4

objection. Thereafter, Finanz took the position that its indemnification obligations had expired on February 23, 2012, six years after the Agreement had closed, and that it was not required to make any additional payments.[1] After Finanz stopped paying Fitzpatrick's legal fees, Fitzpatrick then billed Disney, and Disney paid the fees from that point forward.

The central dispute in this case is whether Finanz, as it contends, is obligated to pay Disney's legal fees only until the six-year anniversary of the Agreement's closing, or, whether, as Disney contends, Finanz is obligated to pay Disney's legal fees after the Agreement's six-year anniversary so long as those expenses arose from a claim asserted against Disney before the six-year anniversary.

On March 22, 2013, the Second Circuit affirmed the dismissal of the complaint in the Disney Litigation. *See Icebox-Scoops v. Disney Enter., Inc. et al.*, 520 Fed. Appx. 3 (2d Cir. 2013). In total, the legal fees and costs of the Disney Litigation (including the appeal) were $459,140. Of that amount, as noted above, Finanz paid $101,689.65 and Disney paid $357,450.35. After Finanz refused to reimburse Disney for the money it had spent, Disney commenced the instant action.

Under Section 3.4(g) of the Agreement, *see supra* at p. 3-4, Disney also seeks the attorneys' fees and costs it has incurred in bringing this action. Finanz does not dispute that, if Disney is granted summary judgment on its breach of contract claim, then it is entitled to its fees in this action.

Finanz brings a counterclaim for breach of contract. It argues that, as to the Fitzpatrick bills that it did pay, it paid more than Disney would have paid had Disney paid Fitzpatrick directly

---

[1] In its brief, Finanz suggests that the six-year anniversary of the Agreement's closing is February 17, 2012. However, the parties entered into the Agreement on February 23, 2006, which Finanz admits. Ultimately, the exact date is immaterial, but, for purposes of this motion, I will assume the six-year anniversary is February 23, 2012.

5

because of discounted billing arrangements Disney had with Fitzpatrick. According to Finanz, it did not receive the benefits of these billing arrangements. Specifically, Finanz paid for: (1) counsel rates that were higher than those rates charged to Disney; (2) online legal research for which Disney does not pay; and (3) postage and related charges for which Disney does not pay. Moreover, Finanz did not get certain discounts that Disney regularly receives. In essence, Finanz complains that Disney had a fee arrangement with Fitzpatrick that afforded it certain discounts and that those discounts were not passed on to Finanz. Accordingly, Finanz argues that it overpaid for Disney's fees. Counterclaim at ¶¶ 18-23. Finanz seeks damages for this overpayment. Additionally, it seeks a declaration endorsing its view of the Clause.

## II. Discussion

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate if the movant demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "A dispute is not genuine unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shiflett v. Scores Holding Co., Inc.*, 601 Fed. Appx. 28, 29 (2d Cir. 2015) (internal quotation omitted). A court is required to "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The moving party bears the burden of proof that no genuine issues of fact exist, but, once it satisfies this initial burden, the burden then shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. "Summary judgment is appropriate where the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party." *Rosenfeld v. Hostos Comty. Coll.*, 554 Fed. Appx. 72, 73 (2d Cir. 2014).

### B. Scope of Ice Box Indemnification

#### 1. Governing Law

Under New York law, which governs the Agreement, unambiguous contracts are interpreted as a matter of law. *See Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, 627 Fed. Appx. 27, 28 (2d Cir. 2015). "Contract language is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Bank of New York Trust, N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 635 (S.D.N.Y. 2007) (quoting *Seiden Assoc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Additionally, even if ambiguous, summary judgment is nonetheless appropriate if "the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

#### 2. The Parties' Dueling Interpretations of the Contract

Disney argues that the Clause should be interpreted so that Finanz must indemnify Disney for any claim asserted by Ice Box within six years after the closing of the Agreement (February 23, 2012), even if the claim was not ultimately resolved within that six-year timeframe. It is Finanz's position that, under no circumstances, is it responsible for paying any expenses incurred by Disney more than six years after the date of closing. In short, Disney argues that the Clause covers any claim that is asserted within the six-year limitation, and Finanz contends that it need

not indemnify Disney after the six-year period has expired, regardless of when the claim was initially asserted.

### 3. Is the Contract Ambiguous?

The text of the Clause at issue reads: "This indemnity shall extend from the date of Closing for six years thereafter." Each party argues that the contract is unambiguous and that, given this lack of ambiguity, I can grant summary judgment in its favor. Each also argues that, if the contract is ambiguous, the ambiguity can be resolved in its favor based upon the extrinsic evidence.

According to Disney, the Clause is unambiguous when one considers the intent of the parties and the Agreement as a whole. *See Gary Friedrich Enter., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) ("[W]e do not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole."). According to Disney, the parties' goal was to ensure that Disney would not be liable to Ice Box for claims arising out of Finanz's termination of Ice Box's license and the subsequent sale of the Trademarks to Disney. Disney argues this intent is manifested by the parties' selection of the six year time limit, which mirrors the six year statute of limitations for breach of contract in New York. Disney notes that it was so concerned about its potential liability to Ice Box that this was the primary obstacle to closing the deal and necessitated a specific carve-out for claims related to Ice Box. In fact, Disney's concerns about litigation were realized when Ice Box sued Finanz and Disney (in separate actions, described above) in relation to the Trademarks. In sum, Disney maintains that, to read the Agreement as Finanz does, would defeat the clear intent of the parties in creating the Clause—namely to assuage Disney's fears that it would face liability from Finanz's termination of the Ice Box license and its subsequent sale to Disney.

Finanz counters that the Agreement simply does not say what Disney wants it to say; it does not say, for example, "This indemnity shall apply to any action or proceeding commenced within six years of Closing." Finanz Opp. at 2. According to Finanz, if the parties, both of whom are sophisticated, wanted to draft the Clause to have the meaning Disney suggests, then they would have done so.[2]

"The mere fact that the Parties disagree on the proper interpretation of a contract does not render the contractual language ambiguous." *R&D Hotel, LLC v. McDonald's USA, LLC*, 2016 WL 3866408, at *2 (S.D.N.Y. July 12, 2016) (internal quotation omitted). Instead, ambiguity exists only "where each of the competing interpretations is objectively reasonable." *United Nat. Ins. Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, 107 (2d Cir. 1993).

Here, Disney's arguments are persuasive in that the undeniable intent of the parties was to protect Disney against timely breach of contract and related claims by Ice Box (the very types of claims Ice Box eventually brought). Interpreting the contract as Finanz suggests would defeat this goal because it would allow for the scenario where Ice Box brought suit within six years, but a judgment or settlement did not materialize until after the six year mark. For this reason, Disney's interpretation is objective reasonable.

Nonetheless, the Agreement, when read literally, also is susceptible to Finanz's interpretation. I need not resolve whether Finanz's literal interpretation can be viewed as

---

[2] Finanz also argues that, under Disney's interpretation, there would have been no reason for the parties to carve out Ice Box claims from the general indemnification clause contained in Section 9.2(a) of the Agreement. This argument ignores that Section 9.2(a) provides a temporally unlimited general indemnification that is financially capped at $3,000,000. By contrast, the Ice Box indemnification provides for a temporally limited indemnification (the scope of which is at issue here), but no financial cap.

9

objectively reasonable because, as will be seen, the extrinsic evidence resolves any ambiguity in Disney's favor.[3]

### 4. Extrinsic Evidence

As noted above, summary judgment is appropriate if "the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co.*, 526 F.3d at 68. Having reviewed the extrinsic evidence submitted by the parties in conjunction with their motions, I conclude that no reasonable fact finder could decide that Finanz's interpretation of the Clause is correct. Accordingly, partial summary judgment as to liability in Disney's favor is warranted on its breach of contract claim.

When discussing extrinsic evidence in its motion papers, Finanz does not offer its own witnesses or documents to support its position. In fact, as Finanz admits as an undisputed fact, Terrence Moorehead, Finanz's witness under Federal Rule of Civil Procedure 30(b)(6), testified that neither he nor anyone currently employed by Finanz knows what Finanz's pre-execution intent was with respect to the Clause.

Disney, in contrast, offers testimony from three witnesses involved in the Agreement's drafting. Mei-Lan Stark, an executive counsel at Disney when the Agreement was drafted, testified that a conference call with Finanz regarding the Ice Box indemnification "came out with that we

---

[3] I reject Finanz's argument that any ambiguity in the Clause must be construed against Disney because Disney drafted the Clause. Though a Disney representative may have been the one to put pen to paper, both parties were actively engaged in the drafting of this Agreement and had ample opportunity to comment on and revise its provisions. In situations such as this one, where both parties are represented by counsel, are sophisticated, have equal bargaining power, and have meaningful opportunities to negotiate the contractual terms, the doctrine of *contra proferentem* does not apply. See *Aircraft Servs. Resales LLC v. Oceanic Capital Co., Ltd.*, 2013 WL 4400453, at *4 (S.D.N.Y. Aug. 14, 2013).

would have a full indemnity for anything that Icebox brought because [Finanz] believed their termination notice [of the Ice Box license] was sufficient and we disagreed and this was critical to getting the deal done." Stark Deposition at 51. According to Stark, on this conference call, a representative from Finanz offered an "uncapped" indemnity, and Disney's understanding was that so long as a demand for indemnification was made within six years of the Agreement's closing, then it would be indemnified for any costs stemming from that claim. *Id.* at 47, 54. Additionally, Eric Muhlheim, senior vice president of strategy and business development for Disney when the Agreement was drafted, testified that a Finanz representative told him "that there was no reason for [Disney] to be concerned and that [Disney] would be indemnified for any action taken by Icebox." Muhlheim Deposition at 64. Pasquale Razzano, Disney's outside counsel on the Agreement and the person who drafted the Clause, testified that he had conversations with James Alterbaum, Finanz's outside counsel, who proposed that Finanz would provide "a full indemnity without limitation against claims made against Disney in the context of the termination of [the Ice Box license]." Razzano Deposition at 39.

Finanz disputes the implications of the testimony relied upon by Disney and argues that it demonstrates that the parties never actually discussed the language of Section 3.4(d). To support this position, Finanz relies on deposition testimony from Stark, Muhlheim, and Razzano in which they stated that they did not specifically recall discussing the language of Section 3.4(d) with Finanz representatives. *See* Muhlheim Deposition at 56, Stark Deposition at 46-47, Razzano Deposition at 39. However, that the parties did not discuss the exact language of Section 3.4(d) does not defeat Disney's showing or create an issue of fact. Disney's witnesses make clear that the parties did discuss the general idea that Section 3.4 was supposed to encompass—that Disney would be fully indemnified for any action brought by Ice Box. Moreover, a draft of the Clause

was not circulated until after the conference call at which the Ice Box indemnification was discussed. Finanz cannot fault Disney for failing to discuss the exact language of Section 3.4 on this conference call because the provision did not yet exist. The very idea of Section 3.4 arose from this call.

To further support its position, Disney notes that, for a short period of time, Finanz paid Disney's legal fees after the Agreement's six-year anniversary. Specifically, Finanz continued to pay these fees through March 31, 2012, approximately six weeks after the date on which Finanz contends it was no longer responsible to pay such fees. "Where a contract is ambiguous, 'the practical interpretation of a contract by the parties manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling, weight in the construction of the contract.'" *Int'l Union of Journeymen Horseshoers & Allied Trades v. Am. Federation of Labor & Congress of Industrial Orgs.*, 2004 WL 3362704, at *14 (E.D.N.Y. Aug. 9, 2004) (quoting *Viacom Int'l v. Lorimar Productions*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980)). Finanz does not dispute that it paid these expenses. Rather, it argues that six weeks is such an insignificant amount of time that its actions cannot be interpreted to support Disney's reading of the Clause.

When viewed in its entirety, the extrinsic evidence presented by Disney supports its interpretation. Disney has offered three witnesses all of whom confirm that the parties reached a general understanding that Disney would be fully indemnified for any claim brought by Ice Box. Finanz, offering no witness or documentation of its own, argues that Disney's witnesses actually support Finanz's interpretation. But Finanz's arguments regarding the evidence proffered by Disney are unpersuasive. Additionally, though the six weeks after the Agreement's six-year anniversary during which Finanz paid Disney's legal fees is indeed a short period of time, Finanz

offers no explanation for its actions, which further supports Disney. In sum, no reasonable fact finder could conclude that the extrinsic evidence supports Finanz's interpretation. Accordingly, I grant Disney's motion for partial summary judgment as to liability on its breach of contract claim. *See Topps Co., Inc.*, 526 F.3d at 68.[4] In light of this ruling, I dismiss Finanz's counterclaim seeking a declaration that its interpretation of the contract is correct.

Additionally, as is undisputed, pursuant to Section 3.4(g) of the Agreement, Disney is entitled to the attorney's fees and costs it has incurred, and will incur, in bringing this action.

### C. Finanz's Counterclaim

Finanz claims that Disney "breached the Purchase Agreement by causing Finanz to be charged (and pay) more than [Disney] would have incurred in indemnifiable fees and costs related to the Icebox Claims." Counterclaim at ¶¶ 28-29. The theory underlying Finanz's counterclaim is that Disney had a fee arrangement with Fitzpatrick—the firm that defended Disney against Ice Box—that afforded Disney certain discounts, but Fitzpatrick did not give it the same discounts. As just one example, Finanz alleges that Disney does not pay Fitzpatrick for online legal research, but that Finanz did pay for this service. Finanz argues that Section 3.4 requires it to indemnify Disney for its fees and that the nature of indemnification is such that "Disney is entitled (at most) to indemnification for costs that Disney actually incurred . . . There is no basis in the Purchase

---

[4] Finanz cites numerous cases for the proposition that indemnity clauses must be strictly construed to avoid expanding indemnity obligations. However, all of these cases discuss whether the claim at issue is of the type envisioned by the indemnity clause, not the amount of time the indemnification clause is to last. *See, e.g., Davis v. Catsimatidis*, 129 A.D. 3d 766 (2nd Dept. 2015). Here, it is undisputed that a lawsuit by Ice Box is the type of claim the parties envisioned when negotiating the indemnity clause, and the parties dispute only the time limit imposed by the indemnification clause. For the reasons discussed, I conclude that the parties' clear intent was to ensure Disney was indemnified for any claim Ice Box brought against it within six years of the Agreement's closing.

13

Agreement for Disney to make Finanz responsible for fees that exceed what Disney would have itself paid if it was not indemnified by Finanz." Finanz Mem. at 16.

Though the parties have submitted numerous exhibits containing Fitzpatrick invoices paid by Finanz, and argue over whether Finanz paid more than Disney would have for the same services, I need not decide whether Finanz actually paid more in fees than Disney would have paid. Section 3.4(e) states:

> In case any demand is made or action filed by Ice Box against [Disney] which triggers [Disney's] rights under the indemnity as stated in Section 3.4, [Disney] shall be entitled at its sole discretion to employ an attorney of [Disney's] own selection to appear and defend [Disney] at the expense of [Finanz].

The Agreement does not state that Finanz will pay Disney for the legal fees it incurs. Instead, it provides that Disney's attorney will be paid "at the expense of [Finanz]." This payment structure is corroborated by the fact that Finanz arranged for payment of Fitzpatrick's fees directly with Fitzpatrick. Disney did not first pay the fees and then seek repayment from Finanz. Only when Finanz stopped paying Fitzpatrick did Disney directly pay the fees to Fitzpatrick.

Finanz offers no evidentiary or legal basis for its statement that Disney "caus[ed]" Finanz to pay more than Disney otherwise would have paid. Fitzpatrick billed Finanz directly, and Finanz paid these bills (for a time)—with no indication that Disney played any role in this billing mechanism. Moreover, there is no language in Section 3.4(e) limiting the attorneys' fees in any way. The provision certainly does not require Disney to ensure that Finanz, the entity receiving the invoices from Fitzpatrick, obtain discounts that Disney would be receiving if the invoices were being issued to it instead of Finanz.

Accordingly, I grant Disney summary judgment dismissing Finanz's breach of contract counterclaim.

## III. Conclusion

For the foregoing reasons, I grant Disney partial summary judgment as to liability on its breach of contract and attorney's fees claims. I also grant Disney summary judgment dismissing Finanz's counterclaims.

**SO ORDERED.**

/s/ Nina Gershon
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
December 5, 2016