UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

DISNEY ENTERPRISES, INC.,

*Plaintiff*,

– against –

FINANZ ST. HONORÉ B.V.,

*Defendant*.

---

Case No. 13 Civ. 6338 (NG) (SMG)

**PLAINTIFF DISNEY ENTERPRISES, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR TURNOVER OR, ALTERNATIVELY, FOR THE
<u>APPOINTMENT OF A RECEIVER</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    The Property Subject To Turnover ..............................................................................3

    DEI's Enforcement Efforts ...........................................................................................5

    Tilton Controls Finanz and This Litigation ................................................................7

    The Zohar Funds/Tilton Litigations ............................................................................9

    The Judgment ..............................................................................................................10

ARGUMENT ....................................................................................................................10

    I.  DEI is Entitled to a Turnover Order of Finanz's Property ...............................10

    II.  Alternatively, The Court Should Appoint A Receiver To Value, Hold, and
        Administer Finanz's Property ...........................................................................13

        A. The Judgment is more likely to be satisfied if a receiver is appointed ........14

        B. Any alternative enforcement remedies may be futile ..................................15

        C. A receiver is warranted to prevent dissipation of Finanz's assets ..............16

CONCLUSION ..................................................................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(s)**

*City of New York v. Venkataram*,
    No. 60-CV-6578 (NRB), 2011 WL 2899092 (S.D.N.Y. July 13, 2011)...........................10, 11

*Coscia v. Eljamal*,
    48 Misc. 3d 361 (Sup. Ct. Westchester Cty. 2015)...............................................................13

*Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*,
    759 F.2d 1053 (2d Cir. 1985) ..............................................................................................13

*In re Gaming Lottery Securities Litig.*,
    No. 96-CV-5567 (RPP), 2001 WL 123807 (S.D.N.Y. Feb. 13, 2001) ............................11, 13

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
    No. 03-CV-6413 (ILG), 2006 WL 616267 (E.D.N.Y. Mar. 6, 2006)........................11, 13, 14

*Gasser v. Infanti Int'l, Inc.*,
    No. 03-CV-6413 (ILG), 2011 WL 2183549 (E.D.N.Y. June 3, 2011) ...................................20

*GE Commercial Fin. Bus. Prop. Corp. v. Hakakian*,
    13 Misc. 3d 413 (Sup. Ct. Nassau Cty., 2006) ....................................................................12

*Hotel 71 Mezz Lender LLC v. Falor*,
    14 N.Y.3d 303 (2010).................................................................................................11, 13, 14

*John C. Flood of Va., Inc. v. John C. Flood, Inc.*,
    700 F. Supp. 2d 90 (D.D.C. 2010), *aff'd*, 642 F.3d 1105 (D.C. Cir. 2011) ...........................12

*JRP Old Riverhead, Ltd. v. Hudson City Sav. Bank*,
    106 A.D.3d 914 (2d Dep't 2013) .........................................................................................13

*Koehler v. Bank of Bermuda Ltd.*,
    12 N.Y.3d 533 (2009).........................................................................................................11

*Melluzzo v. Melluzzo*,
    62 A.D.2d 1061 (2d Dep't 1978) .........................................................................................19

*Mishcon de Reya New York LLP v. Grail Semiconductor, Inc.*,
    No. 11-CV-4971 (JMF), 2012 WL 5512240 (S.D.N.Y. Nov. 13, 2012) ..........................14, 16

*Rosen v. Wolpert*,
    664 N.Y.S.2d 910 (1st Dep't 1997) .....................................................................................12

**CASES**                                                                    **PAGE(s)**

*Victoria Graphics, Inc. v. Priorities Publ'ns,. Inc.*,
   167 Misc. 2d 607 (N.Y. Civ. Ct. Queens Cty. 1996) .......................................................... 12, 13

**STATUTES**

CPLR § 5201(b) ............................................................................................................................... 11

CPLR § 5225 .............................................................................................................................. 1, 11

CPLR § 5225(a) .............................................................................................................................. 11

CPLR § 5228(a) .............................................................................................................................. 13

CPLR § 6219 .................................................................................................................................... 5

Fed. R. Civ. P. 69 ........................................................................................................................... 10

15 U.S.C. § 1060(a) .................................................................................................................... 12, 13

**TREATISES**

Siegel, *N.Y. Prac.* § 512 (5th ed. Jan. 2017 update) .................................................................... 14

**SECONDARY SOURCE**

WGL GAAP Man. 8: Intangible Assets, 2002 WL 31053562 (2018)........................................ 15

## PRELIMINARY STATEMENT

Conventional methods of satisfying plaintiff Disney Enterprises Inc.'s ("DEI")

$865,587.18 judgment against defendant Finanz St. Honoré B.V. ("Finanz") have already proven

futile.  To avoid years more of expensive enforcement proceedings, DEI seeks the turnover

pursuant to CPLR § 5225 of Finanz's:

(i)     domestic and international trademarks;
(ii)    the licenses pursuant to which Finanz's affiliates exploit Finanz's marks;
(iii)   the fragrance oil formulas and product formulations for the products Finanz's affiliates make and sell using Finanz's marks;
(iv)    the licenses pursuant to which Finanz's affiliates exploit those oil formulas and product formulations;
(v)     the copyrights associated with those products; and
(vi)    the licenses pursuant to which Finanz's affiliates exploit Finanz's copyrights.

Patriarch Partners Agency Services LLC ("PPAS")—the terminated administrative agent for the

lenders who purportedly have a senior secured interest in Finanz's property—has no proof of its

continued authority to act on their behalf.[1]  And, although on notice of the Attachment Order and

DEI's judgment, neither the Lenders nor their newly appointed administrative agent, Alvarez &

Marshal Zohar Agency Services ("AMZAS"), have appeared in this action to lay claim to

Finanz's assets.[2]  DEI's turnover motion should therefore be granted in its entirety.

---

[1] As the Court noted in its December 21, 2017 Opinion and Order ("12/21 Order") denying PPAS's motion to intervene and vacate the May 1, 2017 Order of Attachment ("Attachment Order"), "[i]t is clear that there is currently a dispute as to who is the proper agent of the Lenders." (D.E. 125 at fn. 4, annexed hereto as Exhibit J to the accompanying Declaration of William Thomashower dated February 16, 2018 ("Thomashower Decl.").)  The lenders are collectively Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1, Limited ("Zohar II") and Zohar III, Limited ("Zohar III") (collectively the "Lenders" or the "Zohar Funds").  (D.E. 102-3 at 75.)  Finanz is not indebted to the Zohar Funds; it is only a guarantor of the Lender's loans to Dana Classic Fragrances, Inc. ("Dana") and various other affiliated entities.  (*Id.* at 2.)

[2] AMZAS was served with a restraining notice pursuant to the judgment on October 26, 2017, and DEI received the return receipt on October 31, 2017.  (Thomashower Decl. ¶ 12.)  And DEI's counsel spoke with the Lenders' counsel Quinn Emanuel concerning the status of this matter on December 14, 2017.  (*Id.*)

Alternatively, if this property cannot be turned over to DEI, there are "special reasons" that warrant appointing a receiver to prevent fraud and to prevent Finanz (or any person or entity acting in concert with it) from dissipating its assets.

Lynn Tilton ("Tilton"), the founder and CEO of Patriarch Partners, LLC ("Patriarch"), also owns and controls PPAS, which failed to disclose that the Lenders terminated PPAS as their administrative agent as part of their ongoing dispute with Tilton over control of the Zohar Funds and the portfolio companies, *i.e.,* distressed companies, which include Finanz and Dana, that Tilton's acquires through various investment vehicles.  PPAS also failed to disclose that Tilton claims to own, control, and manage Dana, Finanz and their parent company IMG Holdings, Inc. ("IMG").

What is more, discovery from Finanz's former attorneys Lowenstein Sandler LLP ("Lowenstein") and Tilton's admissions in the pending actions between her (and her affiliates) and the Zohar Funds reflect that she has been controlling this litigation from day one as part of a concerted effort to deprive DEI of the benefit of the indemnity it received from Finanz over eleven years ago.

Among other things, Tilton caused Finanz to: vigorously litigate until it lost on liability; challenge DEI's damage calculations; threaten to dispute the reasonableness of DEI's fees both here and in the underlying Icebox action; and then do an about face and abandon the litigation and effectively disappear.[3]

---

[3] Since its default, "Finanz" has surfaced via a Patriarch employee just twice.  Once on October 19, 2017 to serve and file an incomplete and untimely garnishee statement in response to the Attachment Order (Thomashower Decl. Ex. B), and then again in or about December 2017 through that same Patriarch employee to negotiate extensions for Finanz and Dana to respond to DEI's subpoenas in aid of enforcement of the judgment and then to provide an untimely and incomplete response.  (*Id.* ¶ 19; *see also id.* Exs. D–E.)

Now, Tilton is using her control over PPAS to block DEI's recovery by asserting that the loans Finanz guaranteed are underwater and the Lenders, which she also claims to own and control, are senior secured creditors. But, PPAS has been stripped of its authority to act for the Lenders, neither the Lenders nor AMZAS are before the Court, and Tilton and her various affiliates are embroiled in scorched earth litigations with the Lenders over who owns and controls the portfolio companies and the Lenders (a/k/a the Zohar Funds), and who has the right to act on their behalf.[4] Absent a turnover to DEI, the appointment of a receiver is critical to protect DEI's recovery while this tangled web is unwoven.

## STATEMENT OF FACTS

### The Property Subject To Turnover

On October 5, 2017, the Clerk of the Court entered judgment for DEI and against Finanz for $865,587.18 (the "Judgment"). (D.E. 110.)[5] A copy of the Judgment is annexed as Exhibit A to the Thomashower Declaration.

On October 19, 2017, Finanz and Dana each served an untimely garnishee statement in response to the Attachment Order. Neither statement is on corporate letterhead, contains any identifying information such as company name, address, telephone number or email address, and the same person—Dominique Vargas—signed both statements as Vice President of Finance, a title he holds for numerous other Tilton portfolio companies. (Thomashower Decl. Exs. B–E.)

---

[4] In the action between Tilton, 11 portfolio companies and the Zohar Funds entitled *Zohar CDO 2003-1, Limited, et al. v. Croscill Home LLC, et al.,* No. 17-CV-01797 pending in the United States District Court for the District of Delaware, the parties submitted a Joint Chart identifying 10 additional pending actions between them, and specifying the nature of the claims and the status of each such action. A copy of the Joint Chart is annexed as Exhibit T to the Thomashower Decl.

[5] DEI anticipates filing an application for a supplemental judgment at the conclusion of its enforcement efforts to recover the continuing fees and costs it has incurred to satisfy this Judgment.

Copies of Finanz's and Dana's respective garnishee statements are annexed as Exhibits B and C, respectively, to the Thomashower Declaration.

Based on the garnishee statements and the Third Amended and Restated Loan and Security Agreement, dated January 15, 2009 (the "Security Agreement") filed by PPAS as D.E. 102-3 in support of its since denied motion to intervene, DEI has identified the following property that Finanz either owns or has an interest in:

1. 169 worldwide trademark registrations or applications. (*See* Thomashower Decl. Ex. B; United States Patent and Trademark Office ("USPTO") Trademark Electronic Search System ("TESS") records (Thomashower Decl. Ex. BB).)[6]

2. Fragrance oil formulas which Dana and other affiliates use in the fragrances they sell worldwide.  (*See* D.E. 102-3, Schedule 4.15.)

3. Product formulations for the products Finanz affiliates manufacture and sell worldwide.  (*Id.*)[7]

---

[6] Together, Finanz's garnishee statement and the USPTO TESS print-out contain 181 trademarks.  However, ten of the U.S. registrations listed on Finanz's garnishee statement overlap with the TESS search, and therefore were not counted twice.  Excluding the "Tinkerbell" U.S. trademark registration that was previously assigned to DEI from both lists, DEI has identified 169 unique trademarks and applications that Finanz owns.  (Thomashower Decl. Exs. B, BB.)

[7] In its October 19, 2017 garnishee statement, Finanz failed to include the oil formulas and product formulations as well as any licenses pursuant to which the oil formulas, product formulations and trademarks are exploited.  (*See* Thomashower Decl. Ex. B.)

4. 26 copyrights. (*See* Exhibit A to the January 15, 2009 Amendment and Assignment of Intellectual Property Security Agreement, a copy of which is attached to the Thomashower Declaration as Exhibit AA.)[8]

5. The licenses pursuant to which Finanz's affiliates exploit each of the trademarks, the oil formulas and production formulations, and the copyrights.

The Finanz assets identified in paragraphs 1–5 above are sometimes collectively referred to herein as the "Property."[9]

### DEI's Enforcement Efforts

DEI served restraining notices on Finanz, Dana, Ladas & Parry LLP (Finanz's former trademark counsel), Lowenstein, PPAS, Patriarch, AMZAS, and a number of other entities identified in the Security Agreement.[10] (Thomashower Decl. ¶¶ 7–13.) And, after finding that the "restraining notices pursuant to the judgment may not be sufficient, especially since some of the entities served with the restraining notices are not even acknowledging receipt of the notices," the Court granted DEI's application, over PPAS's objection, and extended the

---

[8] The 10 patents listed in Exhibit B to the Amendment and Assignment of Intellectual Property Security Agreement have expired, and DEI is not seeking their turnover here. (Thomashower Decl. Ex. AA.)

[9] In its garnishee statement, Finanz identified that it has an ownership interest in three companies: ████████████████████████████████████ Finanz, however, failed to comply with its obligations pursuant to CPLR § 6219 and identify the nature, percentage, or value of these interests. Accordingly, DEI reserves the right to include Finanz's interests in this entities in its request for turnover either to DEI or to a receiver when DEI discovers that information.

[10] In the 12/21 Order, the Court deemed Finanz served with the restraining notice after the restraining notice sent to the address from which Finanz served its garnishee statement was returned as undeliverable and without a forwarding address. (D.E. 125 (Thomashower Decl. Ex. J.)

Attachment Order "until either the judgment is satisfied or Disney's motion for a turnover and appointment of a receiver is adjudicated." (D.E. 125 at 5–6 (Thomashower Decl. Ex. J).)

DEI has also served discovery in aid of enforcing the Judgment on Finanz, Dana, Lowenstein, and Ladas & Parry. (Thomashower Decl. ¶¶ 15, 18.) Lowenstein has since identified who directed it to act for Finanz, and to whom it reported, on this case. Lowenstein has also identified who paid its bills here. (*Id.* ¶ 16, Ex. L.) After nearly two months of delays and repeated demands, Finanz and Dana just this week responded to DEI's subpoenas with a handful of incomplete documents.[11] (*Id.* ¶ 19.) As with Finanz's garnishee statement, Finanz's response to the subpoena is not on corporate letterhead, contains no identifying information such as company name, address, telephone number or email address, and is also signed by Dominique Vargas. Notwithstanding its deficiencies, Finanz's response confirms, among other things, that Finanz has no (i) corporate offices; (ii) bank accounts in its name; (iii) records of any financial transactions that it has made or which were made on its behalf; (iv) records of its account receivables or payables; (v) royalty statements or other information concerning Finanz's intellectual property that Dana and its affiliates exploit; (vi) communications or other documents concerning this Action, or its involvement therein.[12] (*Id.* Ex. P.)

---

[11] On December 15, 2017, Patriarch's Dominque Vargas contacted DEI's counsel on behalf of Finanz and Dana seeking more time to respond to their respective subpoenas, claiming, among other things, that neither Finanz nor Dana are represented by counsel. (Thomashower Decl. ¶ 19.) Mr. Vargas took this position even though, as the record in the Icebox appeal to the Second Circuit confirms, Finanz and Dana are represented by Charles Michael of Steptoe & Johnson in the Ice Box/Finanz/Dana action. (*See* Thomashower Decl. Ex. CC.) Mr. Michael initially represented Finanz in this dispute with DEI when he was associated with Brune & Richard LLP. (D.E. 49-1 at ¶¶ 80, 87.) That was before Lowenstein took over here and in the litigation between Icebox, Finanz and Dana.

[12] Dana's response, which Dominique Vargas also signed, is equally deficient and provides neither current nor complete information with respect to the purported intercompany financial transactions between Finanz and Dana. (Thomashower Decl. Ex. Q.)

**Tilton Controls Finanz and This Litigation**

According to Tilton, she founded Patriarch Partners LLC in 2000 to invest in non-performing and distressed loans through collateralized loan obligations ("CLO").  (*See, e.g.*, Answer, Counterclaims and Third Party Complaint, *Zohar CDO 2003-1 et al. v. Patriarch Partners, LLC et al.*, No. 17-CV-00307 (WHP), (S.D.N.Y.) ("SDNY CC") at Counterclaim and Third Party Complaint ¶¶ 34–35, 40; Complaint, *Lynn Tilton, Octaluna, LLC et al. v. Zohar CDO 2003-1, Ltd. et al.*, No. CV 2017-013549 (Superior Court of Arizona, Maricopa County) ("Arizona Compl.") at ¶¶ 5–6.)[13]  Tilton asserts that she created the Zohar Funds as special purpose CLOs that would use borrowed funds from investors to, among other things, originate high interest loans to distressed companies, *i.e.* the portfolio companies.  (SDNY CC at Counterclaim and Third Party Complaint ¶¶ 34–71; Arizona Compl. ¶¶ 5–17.)

Tilton says that part of her "unique Zohar strategy" involved "obtaining control over the distressed company by way of [her] acquisition (through affiliated entities) of a controlling stake in their equity, and then relying on [her] experience to manage those companies and turn them around – thereby allowing the companies to repay the principal and interest on the loans." (Arizona Compl. ¶ 6; SDNY CC at Counterclaim and Third Party Complaint ¶ 40.)

Tilton maintains that she *personally* owns the Zohar Funds and the portfolio companies and acknowledges that "since the formation of the Funds, [she] has managed and controlled every aspect of the companies' turnaround through her various roles" and has been a "Manager or

---

[13] A copy of the SDNY CC is annexed as Exhibit U to the Thomashower Decl., and a copy of the Arizona Compl. is annexed as Exhibit V.

director of virtually every portfolio company for many years, as well as the CEO of many of them."

(SDNY CC at Counterclaim and Third Party Complaint ¶¶ 67, 68, 72.)[14]

Finanz and Dana are Tilton portfolio companies currently operating out of Patriarch's

offices at 1 Liberty Plaza, New York, New York.[15]  (Thomashower Decl. ¶¶ 8–10.)  Terrence

Moorehead ("Moorehead"), Dana's former CEO who appeared as Finanz's 30(b)(6)

representative in this case, testified at deposition that Patriarch oversees Dana's operations.

(Thomashower Decl. Ex. R at 115:11–20.)[16]  And, consistent with Tilton's admissions in her

---

[14] Although Tilton's court filings sometimes indicate that she owns and controls the Zohar Funds and the portfolio companies through other entities that she owns and controls, the gravamen of her claims is that she alone controls the equity in both the Zohar Funds and the portfolio companies.  *See, e.g.*, (SDNY CC at Counterclaim and Third Party Complaint ¶¶ 50, 58 ("Control and beneficial ownership of this equity was central to Ms. Tilton's strategy for the Zohar Funds, which included Ms. Tilton gaining control of the companies and implementing her managerial expertise to improve operations, pay off debt, and increase value;" "As a preference shareholder and sole equity owner of the Zohar Funds, Ms. Tilton receives the residual values in the Funds…."); *see also* April 17, 2017 Order of Court of Chancery of the State of Delaware, *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, C.A. No. 12946-VCS, at 4 (Del. Ch. Apr. 17, 2017) (Thomashower Decl. Ex. Y) ("Ms. Tilton maintains that she alone controls the equity of the [portfolio companies]"); Defendants' Motion to Transfer Venue or Stay, *Zohar CDO 2003-1, Ltd. v. Croscill Home LLC, f/k/a Corscill Acquisition, LLC et al.*, No. 17-CV-01797 (D. Del.) ("Motion to Transfer") (Thomashower Decl. Ex. W) ("Ms. Tilton and certain of her entities filed three lawsuits against the Zohar Funds and Alvarez & Marshal Zohar Management LLC *inter alia*, for a declarations that… Ms. Tilton is the ultimate and beneficial owner" of the portfolio companies.").)

[15] In November 2017, restraining notices to Dana's 400 Lyster Avenue, Saddle Brook, NJ address were returned with a forwarding address of 1 Liberty Plaza, New York, New York. (Thomashower Decl. ¶ 7–8.)  In December 2017, Dominique Vargas accepted service of subpoenas to Dana and Finanz at 1 Liberty Plaza, the same address where PPAS and Patriarch are located.  (Thomashower Decl. ¶ 18; *id.* Exs. N, O.)

[16] Moorehead also testified that: Dana is the operating company, which maintains and pays for the registration and renewal of Finanz's trademarks; Dana paid Finanz's legal fees in this action. Finanz has no CEO and no employees of its own, and is merely a shell company that holds IP registrations for Dana's use. (Thomashower Decl., Ex. R, at 14–16).  PPAS's counsel confirmed this.  At the December 11th oral argument on PPPAS's since denied motion to intervene, Ms. Trzaskoma stated that "Finanz… is a non-operating entity that holds trademarks and IP registration.  It's a holding company for all of these intellectual property assets."  (Transcript of the December 11, 2017 Oral Argument ("Tr.") at 44:10–16 (Thomashower Decl. Ex. Z).)

pleadings that she owns and controls the portfolio companies, on January 3, 2018, Lowenstein identified Carolyn Schiff and Windy McCracken as two of the primary individuals to whom it reported and from whom it took instructions concerning this litigation.  (Thomashower Decl. ¶ 17, Ex. L.)  Ms. Schiff and Ms. McCracken are both attorneys who work for Tilton at Patriarch. (Thomashower Decl. ¶ 17, Ex. M.)

**The Zohar Funds/Tilton Litigations**

The ongoing disputes between the Zohar Funds, Tilton and the portfolio companies are replete with claims of corporate theft, fraud, mismanagement, and breach of fiduciary duty.  (*See, e.g., Joint Chart, Zohar CDO 2003-1, Ltd. et al. v. Croscill Home LLC, f/k/a Croscill Acquisition, LLC et al.*, No. 17-CV-01797 (D. Del.) (Thomashower Decl. Ex. T.)  The Zohar Funds accuse Tilton of engaging in an "egregious fraudulent scheme to pillage more than a billion dollars in cash and valuable assets…while leaving the Zohar Funds on a collision course to default on obligations to their own investors." (*See* SDNY CC at Answer ¶ 1.)  Tilton's side claims that MBIA Insurance Corporation and MBIA, Inc., the controlling party for Zohar I and II, has been engaged in a long-running scheme and coordinated effort to steal her companies and assets from her, assets which she values at hundreds of millions of dollars.  (*See* SDNY CC at pp. 1–5.)

The Zohar Funds seek declarations that they own the equity in the Zohar Funds and in the portfolio companies.  (SDNY CC at Answer ¶ 98.)  Tilton seeks declarations that she owns the equity in the Zohar Funds and in the portfolio companies.  (*See, e.g.* Arizona Compl. ¶ 7; SDNY CC at Counterclaim and Third Party Complaint ¶ 57; *id.* at pp. 175–77.)

The Delaware Chancery Court found that Tilton disregards corporate forms and conflates herself with the entities that she controls by "arguing that she (personally) is the beneficial owner of the shares." (Memorandum Opinion, *Zohar II 2005-1, Ltd. et al. vs. FSAR Holdings, Inc. et al.*,

C.A. No. 12946-VCS, at 64 fn. 249 (Del. Ch. Nov. 30, 2017) ("Chancery Decision") (Thomashower Decl. Ex. X).)[17]  And this Court has observed that "someone pulled the strings in the litigation.  Someone hired Mr. Kushner to represent Finanz…and someone made the decision to litigate this case very strenuously and then disappear."  (Tr. at 44:18–45:10 (Thomashower Decl. Ex. Z).)  That someone appears to be Tilton.

**The Judgment**

Although Tilton estimates that the portfolio companies are worth hundreds of millions of dollars and no fewer than three prominent law firms have appeared for Finanz before the Court here and at the Second Circuit, the Judgment remains unsatisfied, and DEI continues to accrue substantial legal fees, for which Finanz is also liable. (Thomashower Decl. ¶ 2.)

## ARGUMENT

### I.   DEI is Entitled to a Turnover Order of Finanz's Property

The Court indisputably retains jurisdiction to enforce its own judgment. *See, e.g., City of New York v. Venkataram*, No. 60-CV-6578 (NRB), 2011 WL 2899092, at \*4 (S.D.N.Y. July 13, 2011).  Fed. R. Civ. P. 69 and Article 52 of the CPLR expressly authorize the Court to order Finanz to turn over to DEI as much of the Property as is sufficient to satisfy the Judgment.

---

[17] During the trial in Delaware Chancery Court, Tilton testified:  "A: [O]nce I was no longer going to be in that collateral management role, I needed to make certain that I, as the owner of that equity and the person who needed to control the liabilities that I would be burdened or suffer with, needed to have that control over it.  Q: And to keep control, you signed irrevocable proxies with yourself correct? A: I signed irrevocable proxies, as I sign everything with myself because I wear all the hats, because I bear all the burden."  (Chancery Decision at 40 n. 172 (Thomashower Decl. Ex. X.).)  Tilton also testified that "Patriarch Partners XIV is the owner of Octaluna II, which made the $38 million of loan assets and --- they're all affiliated with me.  Patriarch Partners XIV owns Octaluna II.  Zohar Holdings own Octaluna II, and Lynn Tilton owns Zohar Holdings. . . .  (I [am] Patriarch Partners XIV); . . ."  (*Id.* at 40 fn. 173 (modification in original) (citations omitted).)  In the Chancery Decision, the Delaware Chancery Court rejected Tilton's claim that she was the beneficial owner of the three portfolio companies at issue in that case, which are unrelated to Finanz or Dana.  (*See generally* Chancery Decision (Thomashower Decl. Ex. X).)

CPLR § 5225(a) expressly provides that "[u]pon motion of the judgment creditor . . . where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff."

Under well settled New York law, where, as here, the Court has personal jurisdiction over a party, it has the authority to order that party to deliver and turnover tangible and intangible property located either within or outside of the state of New York to the judgment creditor. *See, e.g., Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 540 (2009) ("requiring a defendant who is in possession or custody of money or other personal property in which a judgment debtor has an interest to turn over the property or pay the money to the judgment creditor"); *Venkataram*, 2011 WL2899092, at *3–5; *In re Gaming Lottery Securities Litig.*, No. 96-CV-5567 (RPP), 2001 WL 123807, at *2 (S.D.N.Y. Feb. 13, 2001).

CPLR § 5201(b) expressly provides that a judgment may be enforced against any property "which could be assigned or transferred." *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, No. 03-CV-6413 (ILG), 2006 WL 616267, at *4 (E.D.N.Y. Mar. 6, 2006). New York courts thus routinely permit CPLR §5225 to be used to reach a judgment debtor's intangible property. *See, e.g., id.* at *4 (directing turnover of defendant's patent in that case to receiver to liquidate); *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 313 (2010) (ownership of out-of-state limited liability companies are assignable and transferable, and may be used to satisfy a

11

judgment); *Rosen v. Wolpert*, 664 N.Y.S.2d 910, 911 (1st Dep't 1997) (affirming judgment creditor's application for turnover of stock certificate to sheriff).

Because Finanz's trademarks and copyrights are assignable and transferable, they must be turned over to DEI to satisfy the Judgment.[18]  *See Victoria Graphics, Inc. v. Priorities Publ'ns., Inc.*, 167 Misc. 2d 607, 610 (N.Y. Civ. Ct. Queens Cty. 1996) (a trademark may be assigned or transferred so long as it is accompanied by the mark's goodwill); *John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 700 F. Supp. 2d 90, 95 (D.D.C. 2010), *aff'd*, 642 F.3d 1105 (D.C. Cir. 2011) ("The company's trademark and associated goodwill are valuable assets that become part of the bankruptcy estate and can be validly sold, assigned, or transferred by the estate.") (citation omitted); *see also* Lanham Act § 10, 15 U.S.C. § 1060(a) ("assignable with the good will of the business in which the mark is used . . ."); *cf. GE Commercial Fin. Bus. Prop. Corp. v. Hakakian*, 13 Misc. 3d 413 416 (Sup. Ct. Nassau Cty., 2006)("registered trademarks are considered property with a distinct monetary value of their own including the right to receive payment for licensing the trademark").

To preserve the goodwill associated with the trademarks and to allow DEI to recognize their full value either through use or sale, Finanz's trademarks must be turned over with (i) any license agreements pursuant to which those marks are exploited; (ii) the oil formulas and product formulations for the products Finanz affiliates manufacture together with the licenses pursuant to which those oil formulas and product formulations are exploited; and (iii) any copyrights related to or necessary for the exploitation of the products Finanz affiliates manufacture and sell together

---

[18] In its garnishee statement, Finanz lists a 2016 book value of ███████ for its domestic and international trademarks, but claims a substantial amortization reduction in value. (Thomashower Decl. Ex. B.)  Because of this purported ambiguity, DEI is entitled to all of the Property to satisfy its Judgment, with any surplus remaining after liquidation for Finanz.

with any licenses pursuant to which those copyrights are exploited.  15 U.S.C. § 1060(a); *cf.*

*Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1059–60 (2d Cir. 1985)

(a trademark should be transferred with associated tangible assets to preserve good will and to

assist the recipient in continuing to produce goods of the same nature and quality as those

associated with the mark); *Victoria Graphics, Inc.*, 167 Misc. 2d at 611 (a trademark may be

assigned without any tangible assets so long as the mark is assigned to someone who produces

"items substantially the same as those produced by the assignor").  DEI is entitled to immediate

turnover of the Property to satisfy its $865,587.18 Judgment, plus the legal fees and expenses it

continues to incur.  *See JRP Old Riverhead, Ltd. v. Hudson City Sav. Bank,* 106 A.D.3d 914, 914

(2d Dep't 2013); *In re Gaming Lottery*, 2001 WL 123807, at *4.

## II.   Alternatively, The Court Should Appoint A Receiver To Value, Hold, and Administer Finanz's Property

Absent turnover, the Court should exercise its discretion to appoint a receiver pursuant to

CPLR § 5228(a) who is authorized to "administer, collect, improve, lease, repair or sell any real

or personal property in which the judgment debtor has an interest or to do any other acts

designed to satisfy the judgment."  A receiver will be appointed "when a special reason appears

to justify one." *Hotel 71 Mezz Lender LLC*, 14 N.Y.3d at 317 (citations and quotations omitted).

Generally, courts review whether: (1) such appointment will increase the creditor's likelihood of

satisfaction; (2) alternative remedies for satisfaction are less availing; or (3) there is a risk of

fraud, absent the appointment of a receiver.  *See, e.g., id.*  However, any single factor or other

special reason may warrant appointing a receiver.  *See, e.g. Gasser*, 2006 WL 616267, at *4

(appointing receiver upon only considering likelihood of creditor's satisfaction); *Coscia v.

Eljamal*, 48 Misc. 3d 361, 366 (Sup. Ct. Westchester Cty. 2015) (weighing most heavily

likelihood in satisfying judgment in decision to appoint receiver).  And, courts have found a

13

receiver "especially appropriate when the property interest involved is intangible, lacks a ready market, and presents nothing that a sheriff can work with at an auction . . . ." *Hotel 71 Mezz*, 14 N.Y.3d at 317 (citations and quotations omitted); Siegel, *N.Y. Prac.* § 512 (5th ed. Jan. 2017 update).

Tilton's disregard of Finanz's corporate form, and her claimed interest as both Finanz's owner and secured lender together with her disputes with the Zohar Funds are special reasons which justify appointing a receiver here to: (1) collect and preserve Finanz's Property; (2) value and liquidate that Property; and (3) hold the proceeds pending a determination of priority of any competing claims by any senior, secured creditors.

### A.  The Judgment is more likely to be satisfied if a receiver is appointed

There is already a dispute about the value of Finanz's trademarks, copyrights, oil formulas and product formulations.  A receiver will be in a better position than DEI to value and sell that intellectual property, and will thereby significantly increase DEI's chances of satisfying the Judgment.  *See, e.g., Mishcon de Reya New York LLP v. Grail Semiconductor, Inc.*, No. 11-CV-4971 (JMF), 2012 WL 5512240, at *3 (S.D.N.Y. Nov. 13, 2012) (granting turnover order and appointing receiver to conduct sale of patent); *Hotel 71 Mezz.*, 14 N.Y.3d at 517; *Gasser*, 2006 WL 616267, at *4 (appointing a receiver where the value of a patent was uncertain).

To start, DEI cannot even tell if Finanz included all of the marks in its valuation.  Its garnishee statement fails to identify the U.S. registrations of 32 trademarks that appear in a public USPTO TESS search.  (*Compare* Thomashower Decl. Ex. BB (TESS results) with *id.* Ex. B (Finanz's garnishee statement).)  Instead, Finanz lists six different registrations for the mark "English Leather" in Canada, Indonesia, the Philippines, the Republic of Korea, Taiwan, and Uruguay (*id.* Ex. B), but somehow omits the three "English Leather" registrations that are listed in the USPTO TESS results (*id.* Ex. BB).  Finanz also collectively values its 136 trademark

registrations at just over ███████, but provides no valuation for any individual mark.  (*See id.* Ex. B.)

Further, even assuming that Finanz actually valued all of its marks, its claim that its valuation is subject to a reduction "by accumulated amortization in the amount of ███████ per 2016 books and records" raises a red flag because trademarks are renewable and generally have an indefinite life.  (*See id.*)  Therefore, their market value is not typically amortized under generally accepted accounting principles. [19]  *See* WGL GAAP Man. 8: Intangible Assets, 2002 WL 31053562 (2018).

Finally, Finanz has placed *no* value on the 26 different copyrights it saw fit to pay to register with the Copyright Office, and failed to even include the oil formulas and product formulations in its  garnishee statement even though they are identified in the Security Agreement as assets Finanz owns and licenses to its affiliates.

### B.  Any alternative enforcement remedies may be futile

Alternative enforcement mechanisms such as information subpoenas, subpoenas duces tecum to Finanz and its affiliates and depositions will be extremely costly and could prove futile because Finanz's intellectual property may be the only assets available to satisfy the Judgment.[20]

---

[19] None of the purported books or records were provided or specified, and neither Finanz nor Dana provided any information as to the value of the trademarks in their meager document production.

[20] Although Finanz's assertion remains subject to discovery, Finanz and Dana contend that the ███████ in royalties Dana owes Finanz (a number which is presumably growing) for the exploitation of Finanz's intellectual property are offset by Finanz's unspecified and unsecured debt to Dana, leaving an unsecured payable of ███████ from Finanz to Dana.  (*See, e.g.,* Thomashower Decl. Exs. B–C.)  Finanz failed to specify whether those royalties are attributable to the exploitation of Finanz's trademarks, the oil formulas, the product formulas, or something else.  Similarly, in its recent document production, Dana produced random pages from its general ledger to support its claim that any debt Dana has to Finanz is offset by Finanz's debt to Dana. The documents Dana provided are incomplete, refer to a "Voided Journal Entry," and are from

*See, e.g., Mishcon de Reya*, 2012 WL 5512240, at *3 (petitioner had no alternative remedies available where respondent had no other assets and proved unwilling to obtain other financing to satisfy the judgment).

As Dana's former CEO, Terrance Moorehead, testified, Finanz is "a non-operating entity that holds trademark and IP registration [*sic*]" related to the fragrances and body care products Dana sells and has no employees. (Thomashower Decl. Ex. R at 14–16). According to Finanz, the only asset with any value is the intellectual property which Dana exploits. (*Id.* Ex. B.)

Tilton has already forced DEI to spend hundreds of thousands of dollars litigating to secure a judgment to recover $357,000 in damages, and Finanz and Dana have already provided woefully deficient responses to the subpoenas DEI has served to enforce that Judgment. If history is any guide, their recalcitrance will not abate with the passage of time. DEI should not have to complete even more expensive discovery to enforce the Judgment while the Property, which is still being exploited and generating revenue for some undisclosed person or entity, is subject to immediate turnover.

### C. A receiver is warranted to prevent dissipation of Finanz's assets

There is an enormous potential for fraud against DEI in the absence of a receiver. The Court has already found that Finanz "has exhibited evasive conduct in this litigation since the January 11, 2017 court conference. Since that time (which was shortly after [the Court] found it liable), Finanz (1) stopped paying its attorneys; (2) stopped communicating with its attorney, which has caused delay in this litigation; and (3) failed to respond to (i.e., not opposed) DEI's motion for attachment." (D.E. 80 at 5.) Finanz failed to appoint new counsel, and then failed to oppose DEI's motion for summary judgment on damages, and has not appealed any of the

---

2015 and 2016, well before the date of the garnishee statements. (Thomashower Decl. ¶¶ 20–21.)

Court's orders.  It has simply defaulted in this action after years of aggressive litigation, which, as the Court observed at the December 11, 2017 oral argument, has "disadvantaged" DEI.  (Tr. at 50:22–23 (Thomashower Decl. Ex. Z).)

Finanz's evasive conduct continued when Finanz and Dana served garnishee statements without a single piece of identifying information—no corporate letterhead, address, telephone number, or email on October 19, 2017.  DEI nevertheless traced these statements back to Tilton because they were sent from Acme International, another Tilton portfolio company, and Dominique Vargas, who signed both letters, wears multiple hats among the portfolio companies that Tilton owns and controls.  (Thomashower Decl. ¶¶ 5–6, Exs. D–F.)

Worse, at the December 11, 2017 argument, PPAS claimed that it had nothing to do with the underlying litigation between Finanz and DEI, and that it neither knew where Finanz was nor was it in contact with Finanz:

| | |
|---|---|
| The Court: | Then someone pulled the strings in the litigation.  Someone hired Mr. Kushner to represent Finanz – and someone made the decision to litigate this case very strenuously and then disappear. |
| Ms. Trzaskoma: | Your Honor, I'm not here to defend what Finanz did, but Ms. Schwartz – |
| The Court: | Well, what did PPAS have to do with those decisions? |
| Ms. Trzaskoma: | Nothing, Your Honor…. |

(Tr. at 44:18–45:2 (Thomashower Decl. Ex. Z).)

| | |
|---|---|
| The Court: | Do you communicate or does your client communicate with Finanz? |
| Ms. Trzaskoma: | I don't believe so, Your Honor…." |

17

(*Id.* at 49:25–50:3.)

All of the facts available to DEI indicate that PPAS's counsel was mistaken, and that Tilton has been pulling the strings here while hiding behind Finanz (a company she claims to own and control).  By December 11, 2017, Finanz and Dana had moved from New Jersey to Tilton's headquarters at 1 Liberty Plaza.  (Thomashower Decl. ¶¶ 8–9, 18.)  DEI subsequently learned (though not because PPAS disclosed it) that the litigations between Tilton (and her affiliates) and the Zohar Funds over the ownership and control of the funds and the portfolio companies had spread to Arizona, California, and Michigan, and that on November 27, 2017, Tilton (and her affiliates) filed a 136 page Answer, Counterclaims, and Third Party Complaint in the action pending in the Southern District of New York before Judge Pauley (*Zohar CDO-2003-1, Ltd., et al. v. Patriarch Partners LLC,*  1:17-CV-00307) against the Zohar Funds and others pressing Tilton's ownership claims.  (Thomashower Decl. Ex. T.)

It defies credulity that PPAS, which is itself a party to at least one of these litigations, and is owned and controlled by Tilton and also operates out of 1 Liberty Plaza, was unaware that Tilton claims to own and control Dana and Finanz or that she ultimately controlled Finanz's aggressive litigation tactics and its subsequent default.

And the degree of control which Tilton appears to be exercising here is wholly consistent with her respective pleadings in which she claims she actively manages all of the portfolio companies by, among other things, giving input on major decisions, hiring and firing senior employees and requiring regular financial reports. (*See generally* SDNY CC; Arizona Compl.)

 Tilton's "active management" is also evidenced by the Security Agreement which puts her squarely on all sides of the loan transaction which PPAS is now using as an excuse—though

PPAS has not called the loan in default—not to pay DEI. [21]   These apparent conflicts of interest and opportunities for self-dealing only highlight the need for a receiver, particularly since it appears that Tilton used one hat to run up DEI's litigations cost, and then another to claim that Finanz is judgment proof because all of its assets are security for loans from companies that Tilton claims to own and control.

Tilton's investors may have signed up for this kind of thing, but DEI is only here because the Zohar Funds acquired Finanz *after*, as this Court found, it breached its representations and warranties to DEI.[22]   (Thomashower Decl. ¶ 23, Ex. S.)  Lest there be any doubt about the potential for fraud, Finanz's affiliate Dana has already been found liable for fraud relating to a contract to which Finanz was the only signatory because of, among other things, the interrelatedness of the two entities and the executives acting on their behalf.  *See generally Icebox-Scoops, Inc. v. Finanz St. Honore, B.V. and Dana Classic Fragrances, Inc.*, No. 07-CV-00544-NG-SMG (E.D.N.Y.).

In view of the above, DEI is entitled to the appointment of a receiver who can collect, protect, and liquidate Finanz's Property and preserve assets sufficient to satisfy the Court's Judgment.  *See, e.g., Melluzzo v. Melluzzo*, 62 A.D.2d 1061, 1061 (2d Dep't 1978) (appointing a

---

[21] Tilton signed the Security Agreement for PPAS, as its manager, and for each of the Lenders, in her capacity as manager of each of the respective collateral managers.  (Thomashower Decl. Ex. I (signature pages to the Security Agreement).)  Emil B. Giliotti ("Giliotti"), who signed as "President" for each of the three borrowers, including Dana, and as President for each of the eight guarantors, including Finanz, (*id.*), was a managing director of Patriarch Partners LLC from 2007 through 2012, and is now associated with Tilton's portfolio company Acme International.  (*See, e.g.,* Thomashower Decl., Ex. G–H.)

[22] Tilton states that "the structure of the funds was built on the understanding by all stakeholders including MBIA, that Ms. Tilton would wear many hats with respect to the Zohar Funds and the Portfolio Companies.  These roles included collateral manager, active leadership at the portfolio company level, director and/or Manager of the portfolio companies, owner and Manager of Patriarch Partners Management Group, owner and manager of PPAS, portfolio equity owner, and Zohar Fund equity owner." (SDNY CC at Counterclaim and Third Party Complaint at ¶ 55.)

receiver where it was "clear that defendant's property must be managed during the pendency of the enforcement proceeding" to avoid insolvency or fraud); s*ee also Gasser v. Infanti Int'l, Inc.*, No. 03-CV-6413 (ILG), 2011 WL 2183549, at *6 (E.D.N.Y. June 3, 2011) (receiver was authorized to retain all property upon sale of defendant's assets "pending a determination of lien priorities").

## CONCLUSION

For the foregoing reasons, as well as those set forth in the accompanying Declaration of William Thomashower, DEI respectfully requests that the Court grant DEI"s motion in its entirety and either order judgment debtor Finanz to turn over the Property directly to DEI or the Sheriff or immediately appoint a receiver to take control of the Property to prevent dissipation or diversion of Finanz's assets.

Respectfully submitted,

PRYOR CASHMAN LLP

Dated: New York, New York
       February 16, 2018

By: s/William Thomashower

William Thomashower
Counsel
Rebecca L. Matte.
7 Times Square Tower
New York, NY  10036
212-421-4100
*wthomashower@pryorcashman.com*
*rmatte@pryorcashman.com*

*Attorneys for Plaintiff,*
*Disney Enterprises, Inc.*