UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DISNEY ENTERPRISES, INC.,

                Plaintiff,

- v. -

FINANZ ST. HONORE, B.V.,

                Defendant.

----------------------------------------------------------x

**OPINION & ORDER**

13-cv-6338 (NG) (SMG)

GERSHON, United States District Judge:

Before the court are two related motions. Disney Enterprises, Inc. ("Disney") seeks a turnover order, pursuant to Federal Rule of Civil Procedure ("Rule") 69(a) and New York Civil Practice Law & Rules ("CPLR") § 5225(b) or § 5227, against non-party Dana Classic Fragrances, Inc. ("Dana") for $1,200,000 that Dana owes to defendant Finanz St. Honore B.V. ("Finanz") in order to satisfy two separate judgments against Finanz, and requiring Dana to place into escrow $200,000 pending the filing and determination of Disney's final attorneys' fees application. Also before the court is a motion to intervene under Rule 24(a)(2) by Patriarch Partners Agency Services, LLC ("PPAS"), to determine the priority of its interest in the property of non-party Dana and defendant Finanz, and to modify the attachment order entered on May 1, 2017. For the reasons set forth below, PPAS's application to intervene is granted. Because an evidentiary hearing may be necessary to determine which party has the superior right to the assets in question, I defer ruling on Disney's turnover motion and PPAS's additional requests.

I.     Relevant Background

Because I assume the parties' familiarity with the facts underlying this litigation, I provide only a brief overview of the litigation and a description of the facts pertinent to the current dispute.

On December 5, 2016, I granted summary judgment as to liability against Finanz. The amount of damages owed to plaintiff Disney was not resolved at that time. Upon my granting summary judgment to Disney, Finanz, after having vigorously defended the lawsuit, disappeared from the litigation. Finanz's counsel, Lowenstein Sandler LLP ("Lowenstein"), was granted leave to withdraw on May 26, 2017. Since Lowenstein's withdrawal, Finanz still has not appeared or retained new counsel. On April 26, 2017, fearing that Finanz would not pay any judgment ultimately issued against it, Disney moved for a pre-judgment attachment of Finanz's assets, including Finanz's intellectual property. On May 1, 2017, I held a conference regarding Disney's application. The conference was attended by counsel for Disney, Lowenstein (which had yet to be relieved as counsel), and Jeannine Chanes, Esq., who stated that she represented non-party PPAS. At the conference, I granted Disney's motion for an attachment and denied PPAS's oral application to adjourn the conference so that it could move to intervene.

Pursuant to my order (the "Attachment Order"), entered on May 1, 2017, Disney was permitted to attach Finanz's assets in the amount of $700,000, and all persons and entities who received notice of the Attachment Order, including PPAS, were enjoined and restrained from transferring any property in which Finanz had an interest, including Finanz's intellectual property.

On July 31, 2017, PPAS filed a formal motion to intervene in this action, which Disney opposed. On September 18, 2017, I granted Disney summary judgment on damages, and the Clerk of Court entered judgment for Disney in the amount of $865,587.18 on October 5, 2017—Disney's first of two judgments against Finanz. On December 18, 2017, Disney, by letter, requested that the Attachment Order be extended until "either the Judgment is satisfied or a receiver is appointed to take control of Finanz's assets." *See* Docket Entry 123. Disney also asked that the court deem "the restraining notice DEI served on [Finanz] via certified mail on October 26, 2017 sufficiently

served and effective as of that date." *Id.* On December 21, 2017, in a written decision, I denied PPAS's request to intervene, granted Disney's request to extend the Attachment Order, and deemed the restraining notice served on Finanz. *Disney Enterprises, Inc. v. Finanz St. Honore, B.V.*, 288 F. Supp. 3d 546, 548 (E.D.N.Y. 2017).

On February 16, 2018, Disney filed a motion to enforce its judgment against Finanz pursuant to CPLR § 5225(a), or, pursuant to CPLR § 5228, to appoint a receiver. I denied that motion without prejudice on April 19, 2018. On August 8, 2018, Disney filed a motion for additional attorneys' fees incurred in litigating this action since July 6, 2017. I granted that motion on September 20, 2018, and awarded Disney $329,964.94 with no prejudgment interest. The second of the two judgments was then entered. Under the two judgments, Finanz owes Disney $1,195,552.12, or roughly $1.2 million.

On August 30, 2018, Disney filed a new turnover motion, this time under CPLR § 5225(b)[1] or § 5227 against non-party Dana for $1,200,000 that Dana owes to Finanz in order to satisfy both judgments against Finanz; it also seeks to compel Dana to place into escrow an additional $200,000 to be used to satisfy Disney's final attorneys' fees application. Disney requested that I issue an order to show cause in connection with its turnover motion, and, on September 20, 2018, I issued an order requiring Dana to show cause as to why Disney's turnover motion should not be granted. The only response was from PPAS, which filed the motion now before the court, once again requesting that it be allowed to intervene in this action, that I determine the priority of its interest in the Dana and Finanz collateral in opposition to Disney's turnover motion, and that I modify the Attachment Order entered on May 1, 2017 to reflect PPAS's alleged superior interest in the Dana

---

[1] Unlike CPLR § 5225(a), which applies to property in the possession of the judgment debtor, CPLR § 5225(b) provides a mechanism for the turnover of property in the possession of a third party such as Dana.

3

and Finanz collateral. Disney opposes each of these requests, and requests that I grant its turnover motion against Dana. In the alternative, Disney requests that I grant its turnover motion but stay its execution, and allow discovery and an evidentiary hearing before determining priority between Disney and PPAS.

## II. Discussion

### A. PPAS's Application to Intervene

Rule 24(a)(2), which governs intervention as of right, requires that the proposed intervenor:

> (1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action.

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001).

I denied PPAS's previous attempt to intervene on the basis that it did not have a sufficient interest in my granting the Attachment Order in favor of Disney. In doing so, I noted that it is not "illegal nor improper to grant an order of attachment to one creditor simply because another creditor claims a priority," that "the order of attachment serves merely to preserve plaintiff's rights," and that the status quo would be unaffected by my granting Disney's request. *Disney Enterprises, Inc.*, 288 F. Supp. 3d at 549–550 (internal quotation marks omitted). In that opinion, I also acknowledged that the priority of creditors must be determined at some point and that the appropriate time for PPAS to litigate its claimed priority interest would be at a turnover proceeding such as this. *Id.*

Disney now once again opposes PPAS's intervention request on the ground that PPAS does not have standing to assert the interests of secured lenders in the collateral at issue.[2] While PPAS,

---

[2] Other than attacking PPAS's standing in this matter, which I take as an objection to its interest in the litigation, Disney does not assert that any of the other Rule 24(a)(2) factors is not satisfied.

4

in a subsequent letter to the court appears to concede that it has been replaced as the administrative agent for several secured lenders collectively referred to as the Zohar Funds, PPAS contends that it still has an interest in this action through its role as administrative agent for Ark II, a separate secured lender for Finanz and Dana.³ *See* Letter on behalf of PPAS, September 26, 2019, Docket Entry 163. According to PPAS, through its role as Ark II's administrative agent, PPAS is charged with enforcing Ark II's property rights, which gives it an interest in intervening in this action.

In ruling on a Rule 24 intervention request, I "accept as true the non-conclusory allegations of the motion." *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 348, 352 (S.D.N.Y. 2009). PPAS's manager, Lynn Tilton, in her declaration, testified that, on February 5, 2016 the Ark II investment fund "agreed to make loans to the Borrowers that would also be administered by PPAS"; that as administrative agent for Ark II, PPAS "has perfected the lenders' security interests in . . . the Dana and Finanz Collateral by filing UCC filing statements"; that as of October 10, 2018 the "Borrowers (including Dana) owe approximately . . . $1,046,771 to Ark II"; and that "PPAS has continuously served as the irrevocable Administrative Agent for Ark II pursuant to the Security Agreement and will continue to do so even when a new agent takes over such functions for the Zohar funds." Tilton Dec., ¶¶ 5, 8, 13, 21. This testimony, along with the

---

³ According to PPAS's manager, Lynn Tilton, Dana, along with two other entities, originally entered into a loan and security agreement with two investment funds: Zohar II 2005-1, Limited and Zohar CDO 2003-1 Limited. By later amendment, in July 2008, Zohar III, Limited (collectively, the "Zohar Funds") became an additional lender under the loan agreement. On or about January 31, 2009, the parties entered into a Third Amended and Restated Loan and Security Agreement (the "Security Agreement"). The Security Agreement was amended several times thereafter, most recently on February 15, 2016, which added a loan from another fund: Ark II CLO 2001-1, Limited ("Ark II"). As a primary obligor under the Security Agreement, Dana pledged all of its assets as security for the loans. Finanz is a guarantor of Dana's obligations under the Security Agreement, and has also pledged all of its assets as security. According to Tilton, PPAS has perfected the lenders' security interests in all of Dana and Finanz's assets by filing UCC financing statements.

documentary evidence submitted by PPAS, sufficiently establish PPAS's interest in this matter and therefore its right to intervene.

The language of the relevant CPLR provisions contemplates the intervention of parties such as PPAS. Both CPLR §§ 5225 and 5227 provide that the court may permit "any adverse claimant to intervene in the proceeding and may determine his rights in accordance with section 5239." *See* CPLR § 5225, cmt. 5225:5 (practice commentary) ("The intervention of other claimants converts the proceeding into a plenary test of who has the highest right to the disputed money or property. This is what is meant by the reference to CPLR 5239."). CPLR § 5239, for its part, governs "Proceeding[s] to determine adverse claims," and, according to the CPLR commentaries, is considered the "path to the courthouse for a claimant who wants to have a priority or lien or other dispute with another claimant ironed out." CPLR § 5239 cmt. 5239:1 (practice commentary); *see Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Eland Motor Car Co.*, 85 N.Y.2d 725, 729 (1995) ("Rival claimants to the assets or funds may be joined in [CPLR § 5225(b)] proceeding so that the court may prioritize the competing interests."); *Ren-Cris Litho, Inc. v. Vantage Graphics, Inc.*, 107 F.3d 4, 5 n.2 (2d Cir. 1997) ("CPLR § 5239 is another type of special proceeding that permits expedited determination of rights in, or priorities of, property claims. The section is 'quite similar to the special proceedings authorized by CPLR 5225(b) and 5227,' and one 'would hardly know where to draw the line between where those proceedings end and CPLR 5239 begins.'" (citations omitted)).

For these reasons, PPAS's motion to intervene under Rule 24 is granted. Nonetheless, although PPAS has shown a sufficient basis for intervention, i.e., that it may have a priority claim, Disney has raised substantial questions as to that claim, and it will be granted leave to take discovery on the basis for, and extent of, PPAS's claimed priority.

6

### B. Disney's Application for a Turnover Order & PPAS's Additional Requests

Disney makes several arguments as to why its application for a turnover order should be granted now, notwithstanding PPAS's claimed priority.

Disney first argues that PPAS's priority argument is inapposite because a determination of the priority of claims will occur when the turnover order is *executed*—i.e., when the property is actually delivered to the judgment creditor—and not when it is entered by the court, and that I should grant Disney's turnover application notwithstanding PPAS's potentially superior interest. As noted above, CPLR §§ 5225 and 5227 indicate that a turnover proceeding is an appropriate time for a party with a claimed priority interest to intervene. And the CPLR practice commentaries state that "[t]he intervention of other claimants converts the proceeding into a plenary test of who has the highest right to the disputed money or property." *See* CPLR § 5225, cmt. 5225:5 (practice commentary); *see Nat'l Union Fire Ins. Co.*, 85 N.Y.2d at 729. Indeed, I referenced this point in my previous opinion, where I stated:

> To be sure, the priority of creditors must be determined at some point. As Disney indicated at oral argument and reinforced in its letter, it intends to make a motion for a turnover and to appoint a receiver. I conclude, and PPAS appears to agree, that the appropriate time for PPAS to litigate whether its interest is superior to that of Disney's is at such a proceeding.

*Disney*, 288 F. Supp. 3d at 549–50 (citations omitted). In sum, Disney has failed to persuade me that I should grant its turnover request despite PPAS's claimed priority.

Next, Disney addresses PPAS's reference to Dana's garnishee statement dated October 19, 2017, which indicates that Dana's debt to Finanz, $3,578,674.04, is exceeded by the amount of money that Finanz owes Dana. Because Finanz's debt exceeds the amount it is owed, PPAS suggests that Disney's request for a turnover of Dana's assets should be denied because of Dana's right of set-off. *See* New York Debtor & Creditor Law § 151 (codifying the right of set-off); CPLR

7

§ 5225(b) (requiring that proceeding be brought against person in possession of money or personal property "in which the judgment debtor has an interest"). In response, Disney argues that it would be inappropriate for PPAS to be able to exercise, on Dana's behalf, its set-off right because it lacks prudential standing. *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (the "prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves"). Here, I agree with Disney. PPAS may not exercise such a right on behalf of Dana because any right of set-off exists solely between Dana and Finanz—entities that notably have refused to participate meaningfully in these proceedings.[4]

Finally, Disney argues that the Security Agreement is a fraudulent conveyance that should be set aside and any superior interest of PPAS extinguished. Broadly, Disney alleges that the Security Agreement was created to keep debtors, including Dana and Finanz, judgment proof from creditors like Disney, while Tilton extracted exorbitant management fees from the debtor companies through PPAS.

New York Debtor and Creditor Law ("NYDCL") § 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Fraudulent intent in an actual fraud case must be proven by clear and convincing evidence. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995). That said, because evidence of fraudulent intent is difficult to come by, New York law permits courts to rely on "badges of fraud" in determining whether to set aside a fraudulent conveyance. *MFS/Sun*

---

[4] I also agree with Disney that, if Dana had raised this argument in response to my order to show cause, I would have required Dana to further substantiate any set-off claim. Finanz is apparently a non-operating entity with no employees, and it is therefore unclear why it would accrue significant debts to Dana.

*Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995). Here, Disney asserts that three such badges are present: the existence of a close relationship among the parties to the transaction; inadequate consideration; and the transferor's retention of control of the property after the conveyance. *Id.*

As for the first badge, Disney highlights the close relationship and personnel overlap between PPAS, Finanz, and Dana and notes that all of the lenders, guarantors, and borrowers in the Security Agreement are managed by, or have close ties to, Lynn Tilton. Disney asserts that these close relationships indicate that the Security Agreement was not entered into at arms length. Regarding the second badge, Disney notes that the loans have increased in value over time and that another lender, Ark II, was added to the Security Agreement. Disney concludes from these facts that the initial loans were either over-collateralized, or that the lenders continue to provide money to the debtors without the expectation of being repaid. Finally, as for the third badge, Disney asserts that Dana and Finanz have retained all property and assets despite having offered it as collateral in the Security Agreement. Specifically, Disney points out that, even though the Zohar Funds have not been repaid millions of dollars in over ten years, PPAS, while it was administrative agent for them, chose not to declare default against the borrowers. As a result, Dana and Finanz have been able to retain all property and money subject to the lenders' security interest. Disney argues that the presence of these three badges provides a strong indication of an intent to hinder, delay, or defraud creditors.

PPAS asserts that these allegations do not provide a sufficient basis for granting Disney's turnover motion and that Disney has failed to prove that the Security Agreement was entered into with fraudulent intent as required by NYDCL § 276. But Disney raises substantial questions, and I find that it has made a sufficient showing to avoid having its fraudulent conveyance claim rejected

9

outright. That said, I cannot, on this limited record, make a determination of whether the Security Agreement was made with the requisite fraudulent intent that would require it to be set aside. Indeed, the "existence of such [fraudulent] intent 'is generally a question of fact which precludes summary judgment.'" *Steuben Foods, Inc. v. Country Gourmet Foods, LLC*, 2009 WL 3191464, at *9 (W.D.N.Y. Sept. 30, 2009). And a court conducting a 5225(b) special proceeding may only grant summary relief "where there are no questions of fact"; "'it must conduct a trial on disputed issues of fact on adverse claims in a turnover matter.'" *See CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 473 (2d Cir. 2018) (quoting *HBE Leasing Corp.*, 48 F.3d at 633); *Gonzalez v. City of New York*, 8 N.Y.S.3d 290, 291 (1st Dep't 2015); *Gen. Motors Acceptance Corp. v. Norstar Bank of Hudson Valley*, 156 A.D.2d 876, 876 (3rd Dep't 1989).

Therefore, I conclude that an evidentiary hearing may be necessary to determine whether the Security Agreement should be treated as a fraudulent conveyance. *See Advanced Video Techs. LLC v. HTC Corp.*, 2019 WL 4198769, at *1 (S.D.N.Y. Aug. 12, 2019) (ordering an evidentiary hearing where there was some basis for entry of a turnover order, but the record was too limited to determine whether any of the company's principals were its alter ego); *Mitchell v. Lyons Prof'l Servs., Inc.*, 109 F. Supp. 3d 555, 563, 566 (E.D.N.Y. 2015), *aff'd sub nom. Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636 (2d Cir. 2016) (noting that, while discovery is not generally permitted in a turnover action, discovery and a trial were necessary to resolve factual issues in such a motion).

### III. Conclusion

For the reasons set forth above, PPAS's request to intervene on behalf of the Zohar funds is denied and its motion to intervene on behalf of Ark II is granted. The parties are directed to work together to present to the court, by February 12, 2020, the following: (1) an agreed statement

10

of facts relating to a) the basis for, and extent of, Ark II's security interest and b) Disney's claim of fraud; (2) a statement indicating what issues of fact remain; and (3) a statement of what discovery will be needed to resolve those issues. The parties shall then attend a status conference on February 19, 2020, at 10:30 AM.

SO ORDERED.

S/Nina Gershon
NINA GERSHON
United States District Judge

January 29, 2020
Brooklyn, New York

11